UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
KNOXVILLE DIVISION


JAMES SMITH,                                    )
                                               )
            Plaintiff,                         )
                                               )
v.                                             )        No. 3:15-cv-255
                                               )
BABCOCK & WILCOX TECHNICAL                     )
SERVICES, LLC LONG TERM                        )
DISABILITY PLAN,                               )
                                               )
            Defendant.                         )


## MEMORANDUM OPINION

This matter is before the Court on Plaintiff's Motion for Judgment on the

Administrative Record [doc. 15], Plaintiff's Brief in Support of Judgment on the

Administrative Record [doc. 16], Defendant's Motion for Judgment on the Administrative

Record [doc. 20], and Defendant's Brief in Support of Judgment on the Administrative

Record [doc. 21]. For the reasons herein, the Court will grant Plaintiff's motion and deny

Defendant's motion.

## I.    PROCEDURAL HISTORY AND PROCEDURAL POSTURE

Plaintiff James Smith ("Mr. Smith") brought this action under the Employee

Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001–1461, seeking

this Court's review of the final administrative decision of Metropolitan Life Insurance

Company ("MetLife"), which denied Mr. Smith's claim for long-term disability benefits.

[Answer, doc. 5, at 3]. ERISA permits participants or beneficiaries of certain employee

benefit plans to file a civil suit in federal district court for the recovery of benefits under these plans. 29 U.S.C. § 1132(a)(1)(B), (e)(1); *see also id.* §§ 1002(1), 1003(a)–(b) (defining the types of plans to which ERISA applies). MetLife does not dispute that ERISA covers Mr. Smith's plan, Babcock & Wilcox Technical Services, LLC Long Term Disability Plan ("Babcock & Wilcox Plan"). [Answer at 1].

Although courts have resolved ERISA cases through summary judgment and bench trials, the Sixth Circuit, in a concurring opinion, has advised courts not to use either procedure in these types of cases. *See Wilkins v. Baptist Sys., Inc.*, 150 F.3d 609, 617–19 (6th Cir. 1998) (Gilman, J., concurring). Considering only evidence that the parties presented to the administrator, courts should instead review the administrative record and, based on that review, issue findings of fact and conclusions of law. *Id.* at 619. This Court will therefore make findings of fact and conclusions of law that will allow it to enter judgment on the merits. *See Lehman v. Exec. Cabinet Salary Continuance Plan*, 241 F. Supp. 2d 845, 847, 852 (S.D. Ohio 2003) (following *Wilkins* by entering judgment on the merits after making findings of fact and conclusions of law); *Nester v. Allegiance Healthcare Corp.*, 162 F. Supp. 2d 901, 907 (S.D. Ohio 2001) (stating that *Wilkins* requires "a district court to review the administrative record and to render a decision on the merits").

## II.  STANDARD OF REVIEW

Both parties agree that the Court should apply the arbitrary and capricious standard because the Babcock & Wilcox Plan gives MetLife discretion to make determinations regarding Mr. Smith's eligibility for benefits. [*See* Pl.'s Br. At 6; Def.'s Br. at 15]. In ERISA cases, courts typically review an administrator's denial of benefits under the de

2

novo standard, *Moon v. Unum Provident Corp.*, 405 F.3d 373, 378 (6th Cir. 2005), but when "a plan vests the administrator with complete discretion in making eligibility determinations," the Sixth Circuit has traditionally maintained that "such determinations will stand unless they are arbitrary and capricious," *id.* (citing *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989)). More recently, however, the Sixth Circuit stated that "a court reviewing a decision made by a plan administrator with discretionary authority should apply the highly deferential abuse of discretion standard," rather than the arbitrary and capricious standard, *Loan v. Prudential Ins. Co. of Am.*, 370 F. App'x 592, 594 n.1 (6th Cir. 2010) (citing *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 117 (2008)), but now appears to have returned to the arbitrary and capricious standard, *see, e.g.*, *Brown v. Fed. Express Corp.*, 610 F. App'x 498, 503–07 (6th Cir. 2015). This Court will follow the Sixth's Circuit latest precedent and apply the arbitrary and capricious standard to its review of MetLife's denial of Mr. Smith's claim.

The arbitrary and capricious standard is "highly deferential" and "the least demanding form of judicial review of administrative action." *Killian v. Healthsource Provident Adm'rs, Inc.*, 152 F.3d 514, 522 (6th Cir. 1998) (quotations omitted). An administrator's decision is not arbitrary and capricious "if it is the result of a deliberate, principled reasoning process, and if it is supported by substantial evidence," *id.* (quotation omitted), which means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," *McDonald v. W.-S. Life Ins. Co.*, 347 F.3d 161, 171 (6th Cir. 2003) (quotation omitted); *see Davis v. Ky. Fin. Cos. Ret. Plan*, 887 F.2d 689, 693 (6th Cir. 1989) ("When it is possible to offer a reasoned explanation, based on the evidence, for a particular

3

outcome, that outcome is not arbitrary and capricious." (quotation omitted)). Under the arbitrary and capricious standard, courts are "strictly limited to a consideration of the information actually considered by the administrator," *Killian*, 152 F.3d at 522, and must not substitute their judgment for that of the administrator, *Lennon v. Metro. Life Ins. Co.*, 504 F.3d 617, 625 (6th Cir. 2007).

Although the arbitrary and capricious standard must "honor an 'extreme' level of 'deference' to the administrative decision," *Brown*, 610 F. App'x at 504 (quoting *McClain v. Eaton Corp. Disability Plan*, 740 F.3d 1059, 1064 (6th Cir. 2014)), courts may not merely rubberstamp an administrator's decision "as long as the [administrator] was able to find a single piece of evidence—no matter how obscure or untrustworthy—to support a denial of a claim for ERISA benefits," *McDonald*, 347 F.3d at 172 (citation omitted). Rather, ERISA obligates courts to ensure that an administrator conducted a "'full and fair' review of claim denials." *Glenn*, 554 U.S. at 117 (quoting *Firestone*, 489 U.S. at 113); *see* 29 U.S.C. § 1133(2) (requiring a "full and fair review"). To determine whether an administrator provided a beneficiary with a full and fair review, courts should weigh "several factors in reviewing a plan administrator's decision." *DeLisle v. Sun Life Assurance Co. of Can.*, 558 F.3d 440, 444 (6th Cir. 2009).

One of these factors is the "quality and quantity of the medical evidence and the opinions on both sides of the issues." *McDonald*, 347 F.3d at 172. In addition, courts should examine whether the administrator played a dual role as a decision maker and payer of benefits, *Glenn*, 554 U.S. at 112; *Killian*, 152 F.3d at 521, and whether the administrator performed a file-only review of the beneficiary's claim, rather than a physical examination

4

of the beneficiary, *Calvert v. Firstar Fin., Inc.*, 409 F.3d 286, 295–97 (6th Cir. 2005); *Bennett v. Kemper Nat'l Servs., Inc.*, 514 F.3d 547, 554–56 (6th Cir. 2008).[1] Although no one factor is determinative, "any one factor will act as a tiebreaker when the other factors are closely balanced, the degree of closeness necessary depending upon the tiebreaking factor's inherent or case-specific importance." *Glenn*, 554 U.S. at 117.

If a court concludes that an administrator acted arbitrarily and capriciously, it may either remand the case to the administrator for a new review or award benefits to the beneficiary. *Elliott v. Metro. Life Ins. Co.*, 473 F.3d 613, 621–22 (6th Cir. 2006); *but cf. Wenner v. Sun Life Assurance Co. of Can.*, 482 F.3d 878, 881–84 (6th Cir. 2007) (addressing the remedy for *procedural* violations of ERISA). A remand to the administrator is appropriate "where 'the problem is with the integrity of [the plan's] decision-making process,' rather than 'that [a claimant] was denied benefits to which he was clearly entitled.'" *Elliott*, 473 F.3d at 622 (quoting *Buffonge v. Prudential Ins. Co. of Am.*, 426 F.3d 20, 31–32 (1st Cir. 2005)).

## III.  FINDINGS OF FACT

Beginning in November 2002, Mr. Smith worked as a project manager for Babcock & Wilcox Technical Services, LLC ("Babcock & Wilcox") in Oak Ridge, Tennessee. [R., doc. 12, at 26, 71].[2] As an employee of Babcock & Wilcox, Mr. Smith participated in the

---

[1] Courts may also weigh the administrator's consideration of the Social Security Administration's decision regarding total disability and the administrator's reliance on non-medical evidence. *See DeLisle*, 558 F.3d at 444–45. Mr. Smith, however, raises no arguments concerning either of these factors, which the Court therefore does not address.

[2] Pincites to the record refer to the electronic page numbers.

Babcock & Wilcox Plan, [*id.* at 1–10, 96–99], which provides long-term disability benefits to employees who become totally disabled, [*id.* at 6]. Under the Babcock & Wilcox Plan, the language "totally disabled" means that "you are unable to perform the duties of your regular job with the Company due to illness or injury and are under the regular care of a licensed practicing physician." [*Id.* at 312].

In March 2013, bloodwork revealed that Mr. Smith had an elevated count of lymphocytes "highly compatible with chronic lymphocytic leukemia," [*id.* at 555], which later became his diagnosis, [*see id.* at 422]. Mr. Smith left his job at Babcock & Wilcox roughly three months later. [*Id.* at 312; Pl.'s Br. at 4]. On the day after he stopped working, he went to the emergency room, where he complained of "a sensation of numbness and tingling 'sweeping over his body.'" [R. at 548]. He called his oncologist, Dr. John Foust, to inform him that he had gone to the emergency room. [*Id.*]. On the next day, however, he told Dr. Foust that he "is feeling better now." [*Id.*]. Dr. Foust reviewed a CAT scan and bloodwork that Mr. Smith received in the emergency room and stated that the "scan was no different than the one I ordered in early May" and that his bloodwork "actually showed that his white count was better." [*Id.* at 546].

Mr. Smith then consulted with another physician, Dr. Kenneth Luckmann, an internist, because of gastrointestinal distress, just days after his visit to the emergency room. [*Id.* at 524]. During that consultation, Dr. Luckmann observed that Mr. Smith was in Dr. Foust's care for his chronic lymphocytic leukemia, that his recent CAT scan and blood work were otherwise "unrevealing" and "unremarkable," and that his abdominal problems were "[p]ossibly functional." [*Id.* at 524–25]. Later in that same year, after

6

receiving a call from Dr. Alex Alexander, Mr. Smith's primary care physician who was treating Mr. Smith for anxiety, Dr. Foust entered a follow-up note in Mr. Smith's medical record. [*Id.* at 544]. Dr. Foust wrote that Mr. Smith's symptoms have been "totally resolved" and determined that "it does seem that most of his symptoms now were stress related." [*Id.*]. Around this same time, Mr. Smith returned to Dr. Luckmann for a follow-up appointment, and Dr. Luckmann wrote that Mr. Smith had normal vital signs and that he was "alert" and "happy" and "doing well without complaints." [*Id.* at 523].

Despite reporting alleviated symptoms, Mr. Smith applied for long-term disability benefits with MetLife—the administrator of the Babcock & Wilcox Plan, [*id.* at 64]— roughly two months later, citing three causes of his long-term disability: (1) fatigue resulting from his chronic lymphocytic leukemia, (2) chronic gastritis, and (3) high stress levels, which he attributed to "[m]entally processing" his cancer, [*id.* at 607]. In support of his claim, Mr. Smith stated that he suffers "severe upper and lower gas pains . . . lasting most of the day" and "lost approximately 18 pounds." [*Id.*]. Dr. Alexander submitted a physician's statement to MetLife on Mr. Smith's behalf, opining that Mr. Smith is "not physically able to work" and citing "severe chest pain, fatigue, [and] anxiety" as bases for his conclusion. [*Id.* at 83–84]. Mr. Smith later supplemented his claim with a handwritten statement, in which he notified MetLife that although he still experiences chest pains from his chronic gastritis, he had "gain[ed] some of [his] weight back and "[s]ome days [are] good." [*Id.* at 510]. MetLife denied Mr. Smith's claim, determining that Mr. Smith does not satisfy the definition of "totally disabled" under the Babcock & Wilcox Plan:

> The [medical] information indicates you have been diagnosed with Stage 1 Chronic Lymphatic [sic] Leukemia. Your only treatment at this time is repeat laboratory tests every 3 months. The gastritis appears to be under control since you stopped working. You have been prescribed Zanax [sic] and [are] not under the care and treatment of a psychiatric provider for your stress and anxiety.

[*Id.* at 497]. MetLife also cited Dr. Luckmann's opinion that Mr. Smith is "doing well with no complaints" and referred to the "multiple laboratory tests and imaging studies have all been unremarkable." [*Id.* at 497–98].

Mr. Smith appealed MetLife's decision in a letter, in which he informed MetLife that his symptoms had reappeared and in which he recounted additional medical information in support of his appeal. [*Id.* at 26–27]. Mr. Smith wrote:

> Approximately three years ago . . . while eating lunch [i]n my office, with no warning, my heart rate accelerated greatly, my blood pressure spiked and I thought I was having a stroke. My supervisor . . . drove me to [the] site medical where they did an EKG but found nothing apparent. . . . The site ambulance immediately rushed me to the Oak Ridge Hospital. . . . I was released after about 6 hours. They 'guessed' it might have been a panic attack . . . .

[*Id.* at 26]. Mr. Smith also wrote that he went on to experience "several more of these same type[s] [of] episodes," which were accompanied by "elevated symptoms" of gastritis, and he emphasized that chronic lymphocytic leukemia was not, and never was, the reason for his claim. [*Id.*]. Rather, the reasons were continued chest pressure and severe pain, but he noted that he and Dr. Alexander were still "working together to try and find the root cause" behind these ailments, which Dr. Alexander "suspected as stress." [*Id.* at 27].

MetLife retained an "Independent Physician Consultant," Dr. Lee Hartner,[3] to review Mr. Smith's claim on appeal. [*Id.* at 457]. During the appeal, Mr. Smith continued to have the same symptoms, met with his physicians, and underwent additional medical testing—information regarding all of which he submitted to MetLife for Dr. Hartner's review. [*See, e.g.*, *id*. at 349–93]. In the first of four reviews of Mr. Smith's medical information, Dr. Hartner found that Mr. Smith is not totally disabled because, although he had "symptomatic complaints," neither chronic lymphocytic lymphoma nor any other physical condition was responsible for them. [*Id.* at 468]. Dr. Hartner later appended his report to incorporate notes from a phone conversation with Dr. Alexander, who told him that Mr. Smith "has a significant amount of anxiety" and that "this was a major factor in explaining his symptoms," including his gastrointestinal ailments. [*Id.* at 433]. Dr. Hartner, however, again concluded that Mr. Smith is not totally disabled, despite conceding that he is "not qualified to assess whether [Mr. Smith's anxiety] results in any restriction or limitation as that is outside the purview of my specialty." [*Id.*].

In a letter to MetLife, Dr. Alexander summarized his conversation with Dr. Hartner, reiterating that Mr. Smith's "Abdominal/GI problems . . . [are] caused by . . . or aggravated by stress," that Mr. Smith's "work limitations are both physical and more importantly mental," and that Mr. Smith remains totally disabled. [*Id.* at 37–38]. Dr. Foust also sent a letter to MetLife in which he wrote that "the stress caused by [Mr. Smith's] chronic leukemia" is "factual" and worsens his gastrointestinal symptoms. [*Id.* at 435]. Mr. Smith

---

[3] Dr. Hartner is board certified in internal medicine and holds sub-specialty certificates in hematology and oncology. (R. at 470).

then e-mailed MetLife with his records from a follow-up visit with Dr. Luckmann, who indicated that Mr. Smith had lost nine pounds in twenty days, "appears to be anxious," and has "[m]ultiple somatic complaints without obvious physiologic basis." [*Id.* at 357]. In performing a second report, however, Dr. Hartner again concluded that Mr. Smith is not totally disabled, focusing on Mr. Smith's chronic lymphocytic leukemia, without mentioning his anxiety. [*Id.* at 369]. Dr. Hartner then revised this report to include a synopsis of Mr. Smith's gastrointestinal symptoms but reached the same conclusion, once more without mentioning Mr. Smith's anxiety. [*Id.* at 371].

Shortly after Dr. Hartner revised his second report, Dr. Alexander wrote another letter to MetLife, emphasizing that chronic lymphocytic leukemia is not the reason for Mr. Smith's claim and is merely a "stressor to [Mr. Smith's] severe Gastro-Intestinal issues." [*Id.* at 360]. Dr. Alexander also noted that Mr. Smith had lost twenty-one additional pounds, has "extreme anxiety" and "a major chemical imbalance in [his] brain," and had begun new anti-anxiety medication. [*Id.* at 360–61]. Partly in response to Dr. Alexander's letter, Dr. Hartner prepared a third and final report, in which he recognized that Mr. Smith's physical symptoms, including his gastrointestinal symptoms, are "largely psychiatric." [*Id.* at 348]. Although Dr. Hartner acknowledged that "it could certainly be true that there is a basis for functional limitation on the basis of psychiatric illness," [*id.* at 348], he deemed a psychiatric assessment to be "beyond the scope of this review" and concluded again that the "medical information fails to support any functional impairment," [*id.* at 347–48].

Relying heavily on Dr. Hartner's reports but considering "all the documentation" in

the record,[4] MetLife denied Mr. Smith's appeal. [*Id.* at 317]. In doing so, MetLife recognized that "the underlying cause of [Mr. Smith's] symptoms appears to be psychiatric in nature," [*id.*], and that Mr. Smith "could have restrictions and limitations due to [his] psychiatric condition," [*id.* at 316]. Because Mr. Smith, however, had only "just recently beg[u]n" taking anti-anxiety medication and had once stated over the phone that he was not claiming disability resulting from his anxiety, MetLife determined that he did not meet the Babcock & Wilcox Plan's definition of "totally disabled" and was not entitled to long-term benefits. [*Id.* at 317].

## IV.   ANALYSIS AND CONCLUSIONS OF LAW

Mr. Smith argues that the Court should reverse MetLife's denial of his claim because it was arbitrary and capricious. First, Mr. Smith appears to assert that MetLife performed its review of his claim under a conflict of interest because it not only subsidizes but also administers Babcock & Wilcox's Plan. [Pl.'s Br. at 7–8]. Second, Mr. Smith maintains that MetLife's review was arbitrary and capricious because it was a file-only review. [*Id.* at 11–12]. Third, Mr. Smith claims that MetLife failed to provide him with the requisite full and fair review. [*Id.* at 13–14]. In particular, Mr. Smith contends that the record establishes that "he was unable to work . . . on the grounds of stress and anxiety provoked gastrointestinal symptoms," and by relying on Dr. Hartner, a physician who lacks training or experience in the medical field relevant to Mr. Smith's claim, MetLife "failed

---

[4] According to MetLife, this documentation included "everything submitted prior to your appeal, all medical [information] submitted after your appeal, the opinion[s] of your doctors and the opinions of [Dr. Hartner]." [*Id.* at 317].

to meaningfully grapple with Mr. Smith's stated reason for being disabled." [*Id.* at 14].

In response, MetLife argues that "[w]hen a participant has cancer, MetLife's decision to hire an Oncologist is hardly irrational." [Def.s' Br. at 7]. MetLife also insists that because Dr. Hartner conducted four separate reviews, his conclusion "simply cannot be fairly characterized as lacking in thoroughness and much less accuracy," and therefore no examination of Mr. Smith was necessary. [*Id.* at 17–18]. In addition, MetLife contends that the record contains no evidence that supports Mr. Smith's allegation that it pays benefits out of its own pocket under the Babcock & Wilcox Plan. [*Id.* at 17].

## A. Conflict of Interest

An administrator operates under a conflict of interest when it not only evaluates claims but also pays the benefits for those claims. *Glenn*, 554 U.S. at 112. In a similar vein, physicians, when they serve as independent consultants for an administrator, may operate under a conflict as well. *See Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 832 (2003) ("[P]hysicians repeatedly retained by benefits plans may have an 'incentive to make a finding of "not disabled" in order to save their employers money and to preserve their own consulting arrangements.'" (quoting *Regula v. Delta Family-Care Disability Survivorship Plan*, 266 F.3d 1130, 1143 (9th Cir. 2001), *abrogated on other grounds by Black & Decker*, 538 U.S. at 829–34))); *see also Moon*, 405 F.3d at 381–82 ("[W]hen a plan administrator's explanation is based on the work of a doctor in its employ, we must view the explanation with some skepticism." (citation omitted)). When asserting a conflict, however, a beneficiary should rely on more than conclusory allegations. *See Kalish v.*

*Liberty Mut./Liberty Life Assurance Co. of Bos.*, 419 F.3d 501, 508 (6th Cir. 2005) ("[The plaintiff] has offered only conclusory allegations of bias with regard to the [independent physician]."); *see also DeLisle*, 558 F.3d at 445 ("Here, [the plaintiff] offers more than conclusory allegations of bias."). Also, in this circuit, courts review the record for a conflict under the arbitrary and capricious standard, when applicable, rather than resort to one that is more exacting. *Calvert*, 409 F.3d at 293 (observing that several courts have modified the standard of review "to something less deferential" than the arbitrary and capricious standard when examining the record for a conflict but that "this Court has not taken that approach" (citing *Adams v. Thiokol Corp.*, 231 F.3d 837, 842 (11th Cir. 2000))).

Mr. Smith's argument that MetLife both evaluates and pays the benefits for claims has no foundation in the record, consisting of only patchwork quotations from case law that are broad enough to be generally applicable to practically any ERISA case. For instance, Mr. Smith points out that "an actual, readily apparent conflict" exists whenever the same entity "both funds and administers the plan," [R. at 7 (internal quotation marks omitted)], but does not explain how this blanket legal premise applies to MetLife's review in particular. This same shortcoming plagues Mr. Smith's argument regarding a conflict as it pertains to Dr. Hartner. Mr. Smith cites no statistical evidence to show Dr. Hartner, on previous occasions, consistently opined for MetLife that beneficiaries are not disabled or that Dr. Hartner is in fact MetLife's employee rather than an independent consultant. *See Kalish*, 419 F.3d at 508 ("[Plaintiff] failed to present any statistical evidence to suggest that, when retained by [the administrator], [the medical consultant] has consistently opined that claimants are not disabled." (citations omitted)).

13

Indeed, Mr. Smith has performed no discovery, the absence of which explains his inability to cite to the record. Although discovery is generally unavailable in ERISA cases, it is available when a beneficiary seeks to establish an administrator's bias, as Mr. Smith has tried, though feebly, to do here. *Wilkins*, 150 F.3d at 618. In short, the Court is unable to consider Mr. Smith's argument without support from the record, *see Kalish*, 419 F.3d at 508; *see also* E.D. Tenn. L.R. 7.1(b) (instructing parties to include in their briefs "a concise statement of the factual . . . grounds which justify the ruling sought from the Court"), and therefore accords no weight to a conflict of interest as a factor in determining whether MetLife's denial of Mr. Smith's claim was arbitrary and capricious.

## B. File-Only Review

Although "nothing [is] inherently objectionable about a file review by a qualified physician in the context of a benefits determination," an administrator's decision to perform a file-only review, especially when the right to conduct an examination is part of the plan, "may, in some cases, raise questions about the thoroughness and accuracy of the benefits determination." *Calvert*, 409 F.3d at 295–96; *see Kalish*, 419 F.3d at 508 (stating that by placing greater weight on the opinion of a physician who has not examined the beneficiary, an administrator may act arbitrarily and capriciously). These questions may predominate especially when an independent physician's conclusions from a file-only review "include critical credibility determinations regarding a claimant's medical history and symptomology." *Calvert*, 409 F.3d at 297 n.6. Indeed, courts should "not credit a file review to the extent that it relies on adverse credibility findings when the files do not state

14

that there is reason to doubt the applicant's credibility." *Bennett*, 514 F.3d at 555.

An administrator's reliance on a file-only review "standing alone," however, does not require the conclusion that [an administrator] acted improperly. *Calvert*, 409 F.3d at 295; *see McDonald*, 347 F.3d at 170 ("[T]he administrative record did not support the denial of benefits only when [the administrator]'s physician, who had not examined [the beneficiary], disagreed with the treating physicians."). Rather, it is "just one more factor" that courts must consider in determining whether an administrator acted arbitrarily and capriciously. *Calvert*, 409 F.3d at 295. When an independent physician "flatly contradict[s] the conclusions of those who examined" a beneficiary, the administrator's decision to perform a file-only review is more likely to be improper. *Morris v. Am. Elec. Power Long-Term Disability Plan*, 399 F. App'x 978, 990 (6th Cir. 2010).

MetLife's file-only review[5] is a factor that weighs in favor of a determination that the denial of Mr. Smith's claim was arbitrary and capricious because Dr. Hartner flatly refuted Dr. Alexander's conclusions, *see id.*, and downplayed Mr. Smith's symptoms by making an adverse "credibility determination[]," *Calvert*, 409 F.3d at 297 n.6. Dr. Alexander informed MetLife and Dr. Hartner that Mr. Smith's work-related limitations are both physical and mental, [R. at 37], and as to the physical component—the gastrointestinal problems—Dr. Alexander wrote that Mr. Smith experienced "continued daily chest pressure and severe stomach pain," "has constant nausea," "has lost his appetite," "has lost an additional 21 pounds," and is unable to work, [*id.* at 360]. Dr. Hartner concluded,

---

[5] MetLife does not dispute that it conducted a file-only review. [*See* Def.'s Br. at 17–18].

however, that Mr. Smith could work despite these symptoms because his tests show that he suffers from "only chronic gastritis," which caused no "restriction or limitation on the basis of gastrointestinal or internal medicine" and did not "support any functional impairment." [*Id.* at 347–48]. Because Dr. Hartner flatly contradicts the conclusion of the physician who examined Mr. Smith, the Court must consider MetLife's choice to forego a physical examination as a factor that favors a finding of arbitrary and capricious conduct—though, again, it does not support that conclusion by itself.

Also, Dr. Hartner's statement that Mr. Smith suffers from "only chronic gastritis" is an adverse credibility determination, which, however subtle, discounts the evidence in the record that casts Mr. Smith's physical symptoms as severe. *See Bennett*, 514 F.3d at 556 (expressing concern over an administrator's "reliance on file reviews that *imply* that [a beneficiary] is not credible, when in fact, no one who actually examined [the beneficiary] reached that conclusion" (emphasis added)). When MetLife denied Mr. Smith's claim, it in fact adopted Dr. Hartner's implicit determination that Mr. Smith's physical symptoms lack the severity that Mr. Smith, and his physicians, ascribe to them: "[Y]our file is insufficient to support these symptoms are to a severity that would prevent you from performing your regular job." [R. at 317].

MetLife's reliance on this adverse credibility determination is troublesome because none of Mr. Smith's three physicians voiced their misgivings as to the severity of these physical symptoms. *See Bennett*, 514 F.3d at 555 (discrediting a file-only review when the record contains no "reason to doubt the applicant's credibility"). Dr. Foust told MetLife not only that Mr. Smith's chronic gastritis is "indeed factual" but also that Mr. Smith has

16

had a "worsening [of] his symptoms." [R. at 435]. Dr. Luckmann, too, recognized these physical symptoms, noting that Mr. Smith lost nine pounds in twenty days, that he was unable to keep his food down because of nausea and "severe" abdominal pain, and that medication was not helping him. [*Id.* at 357]. The record also shows that Mr. Smith, since the appeal, lost thirty pounds—verifiable, objective evidence. [*Id.* at 357, 360]. MetLife's reliance on Dr. Hartner's adverse credibility determination is an indication that MetLife placed "greater weight" on Dr. Hartner's file-only review than on the opinions of the physicians who examined Mr. Smith—again, a harbinger of arbitrary and capricious conduct. *Kalish*, 419 F.3d at 508 (citation omitted).

### C. Quality and Quantity of the Medical Evidence

"A court's review for arbitrary and capricious decision-making 'inherently includes some review of the quality and quantity of the medical evidence and the opinions on both sides of the issues.'" *DeLisle*, 558 F.3d at 446 (quoting *McDonald*, 347 F.3d at 172). An administrator—and its independent physician—may not simply ignore or refuse to credit reliable evidence that favors a beneficiary's claim, *Black & Decker*, 538 at 834; *Shaw v. AT&T Umbrella Benefit Plan No. 1*, 795 F.3d 538, 547–49 (6th Cir. 2015), or participate in a "'selective review of the administrative record' to justify a decision to terminate coverage," *Metro. Life Ins. Co. v. Conger*, 474 F.3d 258, 265 (6th Cir. 2007) (quoting *Moon*, 405 F.3d at 381)). Although an administrator is "not obliged to accord special deference to the opinions of treating physicians," *Black & Decker*, 538 at 825, it may not reject a treating physician's opinion without "giv[ing] reasons for adopting an alternative

opinion," *Elliott*, 473 F.3d at 620 (citation omitted); *see Bennett*, 514 F.3d at 555 (reproaching an independent physician who "summarize[d]" the medical record and "then conclusorily assert[ed]" that the beneficiary was able to work). In short, "[i]t is not enough . . . to offer an explanation for the termination of benefits; the explanation must be consistent with the 'quantity and quality of the medical evidence' that is available on the record." *Moon*, 405 F.3d at 381 (quoting *McDonald*, 347 F.3d at 172).

In denying Mr. Smith's claim, MetLife did not offer an explanation consistent with the quantity and quality of the medical evidence but performed a selective review of the record, through which it ignored evidence that favors Mr. Smith's claim. When opining that Mr. Smith was not totally disabled, Dr. Hartner, in his first report, devoted the bulk of his attention to Mr. Smith's chronic lymphocytic lymphoma, which he mentioned four times in a brief, six-sentence paragraph. [R. at 468]. Dr. Hartner notes that "there was no indication of progressive CLL," "no identification of symptoms attributable to either CLL or prior treatment for CLL," and "[w]ith regard to CLL . . . clearly no evidence of functional restriction or limitation." [*Id.*]. Yet Mr. Smith, in his appeal letter, had notified MetLife that chronic lymphocytic lymphoma was not the basis for his claim. [*Id.* at 26]. Dr. Hartner had therefore ignored the pertinent medical evidence concerning Mr. Smith's disabilities, namely chronic gastritis and anxiety,[6] while concentrating his review on an "indolent" medical condition that was not part of the claim. [*Id.* at 435]. In Dr. Hartner's addendum

---

[6] Dr. Hartner did note, while summarizing the record, that "[i]t was finally determined that [Mr. Smith's] symptoms were due to anxiety," but he offered nothing further on this topic, including no opinion regarding how Mr. Smith's anxiety does or does not factor into his ability to work. [R. at 468].

to this report—a three-sentence opinion—he based his assessment on Mr. Smith's chronic lymphocytic lymphoma yet again: "[T]here remains no indication that this claimant's CLL is resulting in any restriction or limitation." [*Id.* at 433]. Citing his lack of qualifications, he also declined to address Mr. Smith's anxiety. [*Id.*]. In the addendum, like in the initial report, therefore, Dr. Hartner did not consider the chief medical complaints that comprised the claim—Mr. Smith's chronic gastritis and anxiety.

In Dr. Hartner's second report, he once more wandered from Mr. Smith's principal medical complaints by continuing to underscore Mr. Smith's chronic lymphocytic leukemia, concluding "it is clear that there is no basis for any restriction or limitation in this claimant's ability to work due to CLL." [*Id.* at 369]. Although Dr. Hartner revised this report to address Mr. Smith's chronic gastritis, he merely summarized the medical record in doing so—opening his report, in fact, with the words "[r]eview of gastroenterology records is summarized as follows." [*Id.* at 370]. Dr. Hartner then simply determined, in perfunctory fashion, that "[b]ased on review of these records there is no support for restriction or limitation in work activities," [*id.*], without mentioning Dr. Alexander's opinion or giving a reason for his divergence from it, *see Elliott*, 473 F.3d at 620; *Bennett*, 514 F.3d at 555.

In his third report, Dr. Hartner finally recognized that chronic lymphocytic lymphoma is "clearly not the explanation" for Mr. Smith's symptoms but that they appear to be "largely psychiatric." [R. at 348]. Without offering an opinion on Mr. Smith's psychiatric condition, Dr. Hartner nevertheless reaffirmed his belief that Mr. Smith is not totally disabled—even while acknowledging that "it could certainly be true that there is a

19

basis for functional imitation on the basis of psychiatric illness." [*Id.*]. On the whole, therefore, Dr. Hartner neither confronted the medical evidence that dealt with Mr. Smith's reasons for seeking disability—chronic gastritis and anxiety—nor Dr. Alexander's opinion that Mr. Smith is totally disabled. Building on Dr. Hartner's deficient review, MetLife invoked the contents of Dr. Hartner's reports almost sixty times, by this Court's count, to buttress the denial of Mr. Smith's claim in its letter. [*See* R. at 313–17]. The end result is merely "an explanation for the termination of benefits" rather than "[an] explanation . . . consistent with the 'quantity and quality of the medical evidence.'" *Moon*, 405 F.3d at 381 (quoting *McDonald*, 347 F.3d at 172).

MetLife's review of the medical evidence falls short, however, not only because it participated in a scant and selective review of the record but also because it relied on a physician who lacks training or experience in the field of medicine relevant to Mr. Smith's claim. *See* 29 C.F.R. § 2560.503-1(h)(3)(iii) ("[An administrator] shall consult with a health care professional who has appropriate training and experience in the field of medicine involved in the medical judgment."). By failing to call upon a qualified professional to review Mr. Smith's medical records and evaluate Mr. Smith's mental health, MetLife committed "a serious procedural irregularity," compromising Mr. Smith's right to a full and fair review. *Morgan v. UNUM Life Ins. Co. of Am.*, 346 F.3d 1173, 1177 (8th Cir. 2003); *see Greg v. Transp. Workers of Am. Int'l*, 343 F.3d 833, 843 (6th Cir. 2003) (emphasizing that an administrator must *fully* investigate a beneficiary's assertions before it denies a claim); *Jalowiec v. Aetna Life Ins. Co.*, No. 14-4332 (DWF/LIB), 2015 WL 9294269, at *21 (D. Minn. Dec. 21, 2015) (determining that when an administrator's

20

independent physician elected not to review the beneficiary's physical complaints because they were "beyond the scope of his expertise" and the administrator relied on that physician's report anyway, the administrator acted arbitrarily and capriciously).

Although MetLife claims that Mr. Smith stated in a phone conversation that he was not pursuing his claim based on a mental-health condition, [R. at 315], this conversation, if it occurred,[7] is only a "single piece of evidence" that supports MetLife's decision, and the Court therefore cannot cling to it—particularly in light of the contrary evidence in the record, *McDonald*, 347 F.3d at 172 (citation omitted). Mr. Smith listed "mentally processing the CLL," including "increased . . . stress level," as one of the causes for his initial claim. [R. at 607]. Dr. Alexander, too, listed anxiety as a reason for Mr. Smith's initial claim. [*Id.* at 83–84]. Mr. Smith also indicated to MetLife, in his letter of appeal, that the basis for his claim is anxiety, describing episodes of panic attacks that exacerbated his physical symptoms and noting that Dr. Alexander believed that the "root cause" of his physical symptoms was in fact "stress." [*Id.* at 27].

Throughout the appeal, Mr. Smith's physicians continued to implicate anxiety as the culprit behind Mr. Smith's physical symptoms. Dr. Alexander informed Dr. Hartner that "significant" anxiety is "a major factor in explaining [Mr. Smith's] symptoms." [*Id.* at 433]. Dr. Alexander relayed this same message to MetLife, stating that while Mr. Smith's limitations are physical, they are "more importantly mental." [*Id.* at 37–38]. In yet another instance, he told MetLife that Mr. Smith has "extreme anxiety," "a major chemical

---

[7] The Court finds no evidence of this conversation in the record, apart from MetLife's mentioning it in its letter of denial of Mr. Smith's appeal. [*See id.* at 315].

imbalance in [his] brain," and had begun new anti-anxiety medication. [*Id.* at 360–61]. In this same vein, Dr. Foust stated that "the stress caused by [Mr. Smith's] chronic leukemia" is "factual" and worsens his gastrointestinal symptoms. [*Id.* at 435]. Dr. Luckmann, too, indicated that Mr. Smith has "[m]ultiple somatic complaints without obvious physiologic basis" and "appears to be anxious." [*Id.* at 357]. Even Dr. Hartner opined that "the underlying issues here are largely psychiatric." [*Id.* at 348].

Finally, MetLife's reliance on Mr. Smith's statement that he "just recently began taking medications" for anxiety—a statement that MetLife again claims occurred over the phone—is another signifier that MetLife selectively reviewed the record and seized on unfavorable evidence. [*Id.* at 317]. Indeed, the record establishes that Mr. Smith had in fact begun anti-anxiety medication as early as 2013, [*id.* at 83]—a point that MetLife even recognized when it denied Mr. Smith's initial claim, as to which it wrote, "You have been prescribed Zanax [sic]," [*id.* at 497]. In reviewing Mr. Smith's claim on appeal, MetLife ignored this evidence, never referring to it in its denial of the appeal. Also, to the extent that MetLife argues that the Babcock & Wilcox Plan requires Mr. Smith to be under the treatment of a psychiatrist before he can claim a psychiatric disorder, MetLife reads this requirement into the plan. Under the plan's plain language, a beneficiary must be "under the regular care of a licensed practicing physician," [*id.* at 312], and Mr. Smith met this requirement because, for his anxiety, he was under the regular care of Dr. Alexander, his primary care physician, *see Shelby Cty. Health Care Corp. v. S. Council of Indus. Workers Health and Welfare Tr. Fund*, 203 F.3d 926, 934 (6th Cir. 2000) ("In interpreting the provisions of a plan, a plan administrator must adhere to the plain meaning of its language,

as it would be construed by an ordinary person." (citing *Callahan v. Rouge Steel Co.*, 941 F.2d 456, 459–60 (6th Cir. 1991))).

In sum, the Court agrees with Mr. Smith that MetLife "failed to meaningfully grapple with [his] stated reason for being disabled." [Pl.'s Br. at 14]. MetLife engaged in a haphazard and selective review of the record, downplaying or outright ignoring evidence that was favorable to Mr. Smith's claim. Because MetLife's review was not consistent with the quantity and quality of the medical evidence, the Court must view it as another factor that weighs in favor of a finding of arbitrary and capricious conduct.

## V. CONCLUSION

Even under the highly deferential standard that applies to the review of the record, the Court cannot uphold MetLife's denial of Mr. Smith's long-term benefits. MetLife's review was not characteristic of a deliberate, principled reasoning process. In particular, by conducting a file-only review when a physical examination was necessary and by failing to consider much of the medical evidence—let alone offer an explanation consistent with the quantity and quality of the medical evidence—MetLife lacked substantial evidence for its decision. The Court therefore concludes that MetLife's denial of Mr. Smith's long-term benefits was arbitrary and capricious.

As a result, Plaintiff's Motion for Judgment on the Administrative Record [doc. 15] is **GRANTED**. Defendant's Motion for Judgment on the Administrative Record [doc. 20] is **DENIED**. The Court remands Mr. Smith's current claim to MetLife for a full and fair review consistent with this opinion. The Court will retain jurisdiction, and this case is hereby **STAYED** pending MetLife's review and decision. The Court will enter an order

23

consistent with this opinion.

**IT IS SO ORDERED.**

ENTER:

_____s/ Thomas W. Phillips_____
United States District Judge